UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACOB FREIMARK,

Plaintiff,

v.

BAINBRIDGE ISLAND SCHOOL DISTRICT NO. 303, et al.,

Defendants.

CASE NO. 3:26-cv-05241 BHS

ORDER

THIS MATTER is before the Court on defendants Bainbridge Island School District, Amii Thompson, Annalisa Sanchez, Jill Anderson, Kelly Cancialosi, San Jay Pal, Evan Saint Clair, Robert Drury, and Jennine Rau's motion for summary judgment, Dkt. 48.

**A. Background.**

The case arises from Bainbridge Island School District's termination of Freimark's four-year employment as a para-educator. The facts are largely undisputed and are well-documented. Defendant Annalisa Sanchez is the District's Director of Student Services

and beginning in 2025 was Freimark's supervisor. Freimark was assigned to spend part of his time supporting teacher Jennine Rau at the District's Adult Living Program (ALP), where neurodivergent young adults were taught independent living skills. He spent the rest of his time at the Blakely Elementary School and the Commodore Options School, working with younger students. Dkt. 51.

Sanchez declares that early in the 2025 school year, Rau reported to her that Freimark was frequently using his cell phone during instruction time, and often left the classroom, leaving the students to whom he was assigned unattended. Sanchez declares that the Blakely School Principal reported that Freimark made unsubstantiated statements and written accusations about students, and the Commodore Options Principal reported similar concerns. Dkt. 51.

On September 17, 2025, Sanchez emailed Freimark, requesting a meeting to present him with a "Letter of Direction." She copied and invited Freimark's union representative to attend, if Freimark wished. Dkt. 51-7.

The next day, Sanchez gave Freimark a formal Letter of Direction[1] informing him of four concerns about his work performance: (1) the use of his personal cell phone during instructional time, (2) leaving his assigned work area, (3) directing students outside case manager guidance, and (4) making unsubstantiated statements and written accusations about students. Dkt. 51-1. The letter directed Freimark to correct each of

[1] Freimark contends that this letter is the "material" evidence in the case, Dkt. 65 at 4. His complaint references it as Exhibit A, though it appears neither there nor in the exhibits he subsequently filed at Dkt. 6. In any event, the documentary evidence in the case is undisputed.

these behaviors, and specifically to refrain from using his personal cellphone while working with students "**unless it is an emergency or you have received prior approval from a supervisor**." *Id*. at 4 (emphasis added).

Sanchez declares that she continued to receive reports about the same deficiencies after she sent the letter. Dkt. 51 at 3. On October 10, Sanchez emailed Freimark requesting an October 14, 2025, meeting to discuss ongoing concerns about his job performance and to provide him a Probation Notice Letter. Dkt. 51-7 at 3.

On October 14, Sanchez presented Freimark a letter informing him that she was placing him on probation until November 7, because she continued to "find deficiencies" in his work performance. Dkt. 51-2. The letter described Freimark failing to show for a scheduled meeting regarding the "voice tone" and "level of respect and understanding" he used with his special education students; belittling a student struggling with the word "stereo" on their headphones; and telling a special education student who was picking their nose to "make sure they eat it when they are done." *Id.* The letter directed Freimark to improve his work performance in five ways:

a) Follow all directions provided regarding supporting students' educational plans with fidelity and ask questions if you are unsure how to provide appropriate support for a student. Implement student support strategies only as instructed by the special education case manager or other certified staff. Do not independently alter or direct student behavior or instruction outside the scope of the assigned plan or IEP.

b) Speak to students and staff in a manner and tone that is emotionally and intellectually safe, respectful, and positive at all times while working. Refrain from speaking to staff or students in a manner that is condescending, belittling, insulting, teasing, argumentative, aggressive, unprofessional, disrespectful, or negative.

c) Attend all scheduled meetings.

d) Debrief any challenging student situations with the case manager, building administrator, or Director of Student Services—whether the conversation is initiated by you or by them.

e) Refrain from making verbal or written statements about students that are not based on documented evidence or observations. All concerns must be reported directly and confidentially to certified staff or administration.

Dkt. 51-2 at 3.

On October 28, Rau[2] emailed Freimark after he was observed using his computer in one classroom while two of his students were left unsupervised in another. The email reminded Freimark not to use his cell phone or computer "unless it was for a specific ALP-assigned task." Dkt. 49 at 3.

Rau's email itself is not in the record, but Freimark's own Exhibits B and G confirm that he had a discussion with supervising teacher Jennine Rau regarding the use

---

[2] Rau's Declaration describes several additional incidents in the Fall of 2025. Dkt. 49. Rau declares that she observed and reported to Sanchez that Freimark was on his phone in the classroom and leaving his students unattended on September 26, and that she scheduled a September 30 meeting with Freimark that he did not attend. She reported on October 24 that Freimark had left an assigned student for 20 minutes the previous day. She reported two additional incidents to Sanchez on October 30, including Freimark walking away while Rau was explaining something to Freimark and a student. She declares that a student told her November 7 that Freimark had "left" during Friday clean up. On November 12 she forwarded to Sanchez a substitute teacher's report that Freimark demanded an autistic child repeat herself three times because she had her eyes closed. Dkt. 49 at 4.

Neither Freimark's summary judgment response, Dkt. 65, nor any of his numerous other filings address or rebut any of this evidence.

of his cellphone in class. Freimark's version of the incident focuses on what he claims were inconsistent directives:

> Date: October 28, 2025
> Time: Approximately 9:00 a.m.
>
> 20. After a morning meeting, staff member Jeninne [sic] requested that I exchange phone numbers and directed me to use my phone during work hours and to correspond via email on my phone.
>
> 21. I stated that I could not use my phone due to a prior Letter of Direction.
>
> 22. This interaction demonstrates that Defendants simultaneously restricted and required device use, creating unclear and contradictory expectations.

Dkt. 6 at 8; *see also* Dkt. 6 at 26; Dkt. 71 at 2.

On November 3, Sanchez sent Freimark a letter extending his probationary period, so he could "demonstrate sufficient progress and address new concerns." Dkt. 51-3. The letter informed Freimark that the previously identified deficiencies continued, and that new ones had come to light, including the October 28 incident. It again outlined a list of directives for improvement, including:

> f) Refrain from using any technology that is not directly related to the task assigned by the case manager in support of a student.

Dkt. 51-3 at 3. Sanchez's letter extended Freimark's probationary period to November 14. She explained that her "final report" at the end of that period would indicate whether (1) Freimark's improvement warranted removal from probationary status, (2) his lack of progress would lead to termination for cause, or (3) some level of progress would lead to an extended probationary period. *Id.*

On Friday, November 14, Sanchez emailed Freimark a letter informing him that the probationary period was ended and that she was considering his termination. She reiterated the directives he had been given in September and October and explained that there had been additional "incidents of concern." She informed Freimark of his right to a *Loudermill* hearing and to union representation, and that after the hearing a decision on the proposed discipline (termination) would be made by the District's Superintendent and Board of Directors. The hearing was scheduled for Monday, November 17. Dkts. 51-4, 51–7 at 6.

Freimark apparently emailed Sanchez over the weekend, and requested the hearing be moved, though his emails are not in the record. Sanchez rescheduled the hearing for Tuesday, November 18. 51–7 at 6.

On November 17, Freimark sent Sanchez a nine-page letter in lieu of an in-person *Loudermill* hearing. Dkt. 50-2. He explained that he did not want a union representative, because the representative had been "useless" at the earlier meeting. He asserted that Sanchez's investigation was based solely on "some emails being sent," but it is unclear who sent them, to whom, regarding what, or when. *Id*. at 3. He asserted that he had been "banned" from using his phone, and that he "understood" the "directive" to be that he could "not use email at all." *Id*. He accused Sanchez of conducting a "witch hunt" and of violating his due process rights. *Id*.

Freimark's letter also addressed Sanchez's "bullet pointed accusations." *Id*. at 4. He asserted that he was not in a supportive environment, and that his supervisors were condescending and refused to allow him to ask questions. He explained that, due to his

musical background, he prides himself on his "exceptional tonal qualities;" he is a member of "varying acting and choral groups," was cast in a musical play, and he spends "no less than four hours a weekend doing karaoke in public." *Id.* at 5–6.

Freimark's letter claimed the "no phone" directive conflicted with his safety training, which suggested that phones could be a useful tool in de-escalating. Dkt. 50-2 at 6. He claimed he "wandered" because he did not like to waste taxpayer dollars doing nothing, and that by "confiscating" his phone and email "tools," Sanchez and the District left him with no "school sanctioned" means of communication. *Id.* at 3, 9. He asked Sanchez to send her termination decision to him via "snail mail" because he was trying to "follow the directive of not using my email[.]" *Id.* at 8–9.

The next day, Sanchez sent Freimark a letter informing him that she would separate him from employment, subject to the Board's December 11 approval. Dkt. 51-6. She notified Freimark of his right to request a meeting with the Board and placed him on leave without pay pending the Board's decision. *Id*.

Freimark did not request a meeting, and the Board approved Freimark's separation on December 11, 2025.

Freimark sued in March 2026. His Complaint is sparse. Dkt. 3. It alleges that beginning September 1, 2025, he was subjected to "restrictions preventing the use of communication tools necessary for off-campus student supervision." *Id*. at 4. He claims that on September 2, 2025, he "attempted to document a serious student incident while off campus. Restrictions created an engineered impossibility: [I] could neither comply with reporting obligations nor avoid discipline." *Id*. at 4. Freimark alleges he "objected

orally" to the restrictions, "citing compliance and student safety concerns." *Id*. He alleges that "subsequent events confirmed that lack of communication tools directly endangered students." *Id*.

Freimark's Complaint references and incorporates several exhibits, but only Exhibit K (a damages calculation) is attached. Dkt. 3, 3-1. He filed other exhibits at Dkt. 6. Exhibit G reflects a similar incident where Freimark again interpreted Sanchez's Letter as a prohibition on any phone use, even in an emergency:

> Date: October 16, 2025
> Time: Approximately 10:30 a.m.
> Location: Bloedel Job Site
>
> 10. On October 16, 2025, an ALP student was injured while working at the Bloedel job site.
>
> ***
> 14. The student requested emergency medical services; however, based on observable condition and available information, the injury did not appear to require emergency intervention.
>
> 15. During this incident**, I understood that the previously imposed communication restrictions would have limited my ability to directly contact emergency services** if circumstances had escalated.
>
> 16. I communicated concerns that such restrictions could create safety risks during future incidents.

Dkt. 6 at 21 (emphasis added).

Freimark contends he was terminated for telling Sanchez about the adverse effects of his phone restriction on student safety—a matter of public concern—and that his termination violated his First Amendment right to free speech. Dkt. 3.

Freimark also alleges other para-educators used their cell phones at work and were not terminated, and that his termination thus violated his constitutional right to Equal Protection. He contends that he was not provided notice or an opportunity to respond to "incomplete" evaluations, and that his termination violated his constitutional right to Due Process. Freimark also asserts a 42 U.S.C. § 1983 *Monell* claim against the District based on his claim that it ratified his termination, and § 1983 claims against the individual defendants for personally participating in the constitutional violations. *Id*.

Freimark alleges he "raised safety and compliance concerns regarding these restrictions," and was then "disciplined for alleged 'failure to communicate' and supervision deficiencies directly caused by the imposed restrictions." *Id.* at 3. He contends that this demonstrates that the reasons given for his dismissal were pretextual. *Id*. at 4.

Defendants seek summary judgment on each claim. The issues are addressed in turn.

**B. Discussion**

**1. Summary judgment standard.**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in

that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The moving party bears the initial burden of showing that there is no evidence that supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. at 248.

**2. Freimark has failed to provide any evidence that he was terminated for speaking out as a private citizen on a matter of public concern.**

Freimark's core claim is that the District violated his First Amendment rights by terminating him in retaliation for speaking out on student safety—specifically, his complaints that the district's "no phone use" directive could endanger students. Dkt 3.

Defendants correctly contend that to prevail on a First Amendment retaliation claim, a public employee must demonstrate that he spoke as a citizen (not an employee) and that the subject speech addressed a matter of public concern. Dkt. 48 at 8 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). They contend that, viewed in the light most favorable to him, the evidence is clear that Freimark relayed his "phone restriction safety concerns" to Sanchez and the District, as part of his job. They correctly contend that speech within the scope of public employment is not protected merely because it touches on a public concern. *Id*. (citing *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016); and *Hagen v. City of Eugene*, 736 F.3d 1251, 1253 (9th Cir. 2013)).

Freimark's response contends there are material questions of fact about the Letter of Direction:

> [W]hat restrictions were imposed, how those restrictions affected Plaintiffs ability to perform, what communications Plaintiff attempted to make, what Defendants knew, and whether the conduct later relied upon was affected by the restrictions imposed upon Plaintiff.

Dkt. 65 at 4. He disputes that his communications "were made pursuant to his official duties," *id*., but then demonstrates that they were:

> Plaintiff's responsibilities involved the care, supervision, and support of students. Plaintiff communicated concerns concerning student safety, welfare, and workplace compliance. Under a context-specific analysis, protected public-employee speech cannot be summarily dismissed as official-duty speech. *See Garcetti*, 547 U.S. at 421‑24; *Lane v. Franks*, 573 U.S. 228, 236‑37 (2014).

*Id*. Freimark does not assert or demonstrate that he spoke out as a private citizen; he concedes he spoke out as part of his job to care for the students he supervised.

Defendants also assert, persuasively, that Freimark has no evidence supporting a coherent causation theory: he does not actually claim he was disciplined or terminated because he spoke out as a private citizen on matters of public concern, but instead that his deficient job performance was the result of the District's "no phone" policy, which in turn led to his inability to do his job, ultimately leading to his termination. Dkt. 48 at 9.

Freimark's summary judgment response confirms this view: "Plaintiff contends Defendants restricted his communication tools and subsequently relied upon conduct occurring during that restricted period as grounds for discipline." Dkt. 65 at 5. He cites no authority for the proposition that this amounts to First Amendment retaliation; it does not even involve speech. It is instead an implausible claim that he under-performed because the District would not permit him to use his phone to communicate at work.

There are other problems with Freimark's First Amendment retaliation claim. First, it is clear under any view of the evidence that the factual premise behind it is false: there is no evidence the District ever imposed a blanket "no phone" restriction on Freimark, or that it "confiscated" his phone.

Sanchez's Letter of Direction instead made clear that Freimark was not to use his phone in the classroom, "**unless it is an emergency or you have received prior approval from a supervisor**." Dkt. 51-1 at 4 (emphasis added); *see also* Dkt. 49 at 3 (Rau reminded Freimark on October 28 to "only use his computer for specific ALP-assigned tasks"); Dkt. 51-3 at 3 (Sanchez's November 3 letter reiterated that Freimark was to "refrain from using any technology that is not directly related to the task assigned by the case manager in support of a student."). Freimark's core claim that Sanchez's

phone restriction precluded him from using his phone in an emergency, creating a safety hazard, is based on an interpretation of Sanchez's letter that is unsupportable as a matter of law. There is simply no evidence that Sanchez or the District ever told Freimark he could not use his phone for work-related tasks, or in an emergency. The "engineered impossibility" of which Freimark repeatedly complains is based entirely on his own untenable reading of the letter.

Second, Freimark's claim that defendants retaliated against him (by disciplining and ultimately firing him) for "speaking out" about student safety is temporally impossible. Freimark spoke about safety concerns only *after* Sanchez sent the Letter of Direction directing him to (among other things) refrain from personal cell phone use while he was working with neurodivergent students, except in an emergency. His responsive claim that such a restriction would endanger students, not only makes no sense, but it also demonstrates that the discipline was not in retaliation for speaking about safety. Sanchez's Letter of Direction predated any "speech on a matter of public concern." There is no evidence and no reasonable inference the District's documented concerns about Freimark's job performance and his personal use[3] of a cellphone while in the classroom were retaliation for Freimark's subsequent speech about the effect of the letter on student safety.

---

[3] Freimark's Exhibit G, Dkt. 6 at 25–26, and one of his withdrawn summary judgment responses, Dkt. 70 at 2, assert that he did not "personally own" the phone in question, and that he therefore could not have violated the "no personal phone use" directive. This argument, like his claim that his tone of voice is "exceptional," relies on a tortured and unsupportable reading of the District's communications. It is without substantive merit.

In any event, Freimark's use of his phone for non-work related and non-emergent, personal purposes was only one of several documented deficiencies in his job performance. His response does not dispute any of them. Dkt. 65.

Freimark has failed to meet his summary judgment burden of providing evidence that, viewed in the light most favorable to him, would permit a reasonable jury to find that he was disciplined in retaliation for speaking out as a private citizen on a matter of public concern. There are no genuine issues of material fact, and the defendants are entitled to judgment as a matter of law. Their motion for summary judgment, Dkt. 48, is **GRANTED,** and Freimark's First Amendment retaliation claim is **DISMISSED** with prejudice.

**3. There is no evidence that the District treated Freimark differently than other para-educators.**

Freimark's Equal Protection claim consists of three conclusory allegations:

> 1. Plaintiff was similarly situated to other para-educators but treated differently.
>
> 2. Defendants disciplined and terminated Plaintiff for conduct tolerated for comparators.
>
> 3. Actions deprived Plaintiff of equal protection under the Fourteenth Amendment.

Dkt. 3 at 5–6.

The defendants reasonably construe this as a claim that other para-educators were permitted to use their phone for non-work related and non-emergency personal purposes. They argue that Freimark has not identified and cannot identify any such comparator. They emphasize that the District sought to correct and improve numerous aspects of

Freimark's job performance before it ultimately terminated his employment, and that he has not identified anyone with a remotely similar record who was treated differently. Dkt. 48 at 9–11, Dkt. 80 at 5.

Freimark's response does not address this argument, and it does not point to any evidence that any similarly situated employee was treated any differently. Instead, it asserts only:

> Genuine disputes of material fact pervade Plaintiff's federal claims under 42 U.S.C. § 1983. Under *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the factual circumstances known to the decisionmakers who approved the termination, the existence of differential treatment compared to similarly situated peers, and the ratification of disciplinary actions by final policymakers all present issues relevant to the claims asserted by Plaintiff.

Dkt. 65 at 6.

It takes more than this to survive summary judgment. It is the plaintiff's burden to demonstrate with admissible evidence there exists "differential treatment compared to similarly situated peers." He has offered no such evidence. Defendants' motion for summary judgment on Freimark's Equal Protection claim is **GRANTED** and that claim is **DISMISSED** with prejudice.

**4. There is no evidence supporting Freimark's claim he was denied notice or an opportunity to be heard about the matters that led to his termination.**

Freimark's procedural due process claim is also brief and conclusory. He alleges:

1. Plaintiff had a property interest in continued employment.

2. Defendants relied on incomplete and inaccurate evaluations.

3. Plaintiff was deprived of notice and opportunity to respond.

Dkt. 3 at 6.

Defendants' summary judgment motion accurately lays out the requirements of due process in the employment context, including *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)'s familiar requirement of a pretermination hearing, written or oral notice of the "charges," an explanation of the evidence and an opportunity for the employee to present his side of the story. Dkt. 48 at 11 (citing *Fuller v. Dep't of Employment Sec*., 52 Wn. App. 603 (1988)). They point out that Sanchez provided Freimark ample written notice of her concerns, the areas in which improvement was required, and the consequences of a failure to so improve. *Id.*; *see also* Dkts. 51 and 50-2.

Freimark's response asserts that he was not afforded sufficient time to respond to the allegations in the underlying Letter of Direction (September 18, 2025), and the fact he wrote a lengthy response two months later does not eliminate the "factual dispute concerning the adequacy of the process as a whole." Dkt. 65 at 5.

There is no factual dispute about the process that led to Freimark's termination, more than two months after the initial Letter of Direction, after numerous meetings and warnings, and after Freimark elected not to attend the proffered (and re-scheduled, at his request) *Loudermill* hearing. Freimark did not seek additional time to prepare or respond.

There is no evidence that would permit a reasonable jury to conclude that Freimark did not have notice of the "charges" against him or a meaningful opportunity to be heard. He did, as a matter of law.

The Defendants' motion for summary judgment on Freimark's Due Process claim is **GRANTED**, and that claim is **DISMISSED** with prejudice.

**5. There is no evidence the District had a policy that led to a constitutional deprivation, or that any defendant ratified an unconstitutional act.**

Freimark's remaining claims—a *Monell* claim based on a policy that was the moving force behind a constitutional violation, or the ratification of an unconstitutional act—necessarily depend on an underlying constitutional deprivation. For the reasons explained in this Order, there is no evidence of any such violation. The defendants' motion for summary judgment on Freimark's *Monell* claims against the District and on his § 1983 claims against the individual defendants for ratifying or personally participating in the constitutional deprivation is **GRANTED**, and those claims are **DISMISSED** with prejudice.

Freimark has failed to meet his summary judgment burden of providing evidence which, viewed in the light most favorable to him, would permit a reasonable jury to find in his favor on any of his claims. There are no genuine issues of material fact, and the defendants are entitled to judgment as a matter of law. Their motion for summary judgment, Dkt. 48, is **GRANTED,** and Freimark's claims against them are **DISMISSED** with prejudice.

***

Freimark has recently filed twelve additional documents, Dkts. 77, 78, 79, 81, 82, 83, 84, 85, 86, 87, 88, 91. These include yet another response to this motion, Dkt. 85, and a "stipulated" motion for dismissal with prejudice, Dkt. 88, which no defendant has

signed, and which implausibly suggests they have agreed to pay him a $25,000,000 settlement. The Court has repeatedly warned Freimark against such filings, and expressly told him that the case would be dismissed if he filed any additional responses to the defendants' motion. Dkt. 75; *see also* Dkts. 13, 45, 63, 64, 69. Separately, and independently, the case is **DISMISSED** as a sanction for Freimark's incessant improper filings.

The Clerk shall enter a **JUDGMENT** and close the case.

**IT IS SO ORDERED**.

Dated this 25th day of September, 2026.

BENJAMIN H. SETTLE
United States District Judge